**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**Wanda Glenn,**

      **Plaintiff,**

**-V-**

                                      **Case No. 2:2003cv0572**
                                      **JUDGE SMITH**
                                      **Magistrate Judge Abel**

**Metropolitan Life Insurance
Company, et al.,**

      **Defendants.**

**OPINION AND ORDER**

Plaintiff seeks, *inter alia*, reinstatement of long term disability ("LTD") benefits under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1132 ("ERISA"). Both sides move for entry of judgment on the administrative record (Doc. 9 and Doc. 10).  For the reasons that follow, the Court orders the entry of judgment in favor of defendants and against plaintiff.

**I.  Facts**

Plaintiff is an individual citizen of the State of Ohio.  She is a participant in the subject Sears, Roebuck and Co. ("Sears") Group Long-Term Disability Plan ("Plan").  Defendant

Metropolitan Life Insurance Company ("MetLife") is the Plan
fiduciary, and makes decisions regarding claims for Plan
benefits.  MetLife both reviews and pays claims for benefits
under the Plan.  Sears is the Plan sponsor and administrator.

The Plan contains two definitions for the term "totally
disabled."  The first applies to the initial determination of
disability, and provides that a participant is totally disabled
when she is "completely and continuously unable to perform
each of the material duties of [her] regular job."  AR 14.  The
second definition becomes applicable after the first twenty-four
months of benefit payments, and additionally requires that the
participant be "completely and continuously unable to perform
the duties of *any* gainful work or service for which [she is]
reasonably qualified taking into consideration [her] training,
education, experience, and past earnings." Id. (emphasis added).

Plaintiff worked for Sears as a sales manager in the
women's department from 1994 until she became disabled.  AR
153. Plaintiff was responsible for supervising other employees,
ensuring that her department was properly stocked with
merchandise, satisfying the needs and demands of customers,
and problem identification and solution. AR 174-176. Plaintiff's

2

responsibilities included direct supervision of twenty to thirty sales associates. AR 170.

Plaintiff worked forty to fifty hours per week before she became disabled.  Id. Plaintiff's job at Sears required sitting 1-19% of the workday, standing 20-60% of the workday, and walking 61-100% of the workday. Her job also included some climbing, reaching, stooping, and lifting. Id.

Plaintiff stopped working on April 30, 2000 due to cardiomyopathy.[1] AR 128, 149.  Her doctor, Raj. C. Patel, M.D., described plaintiff's symptoms as general fatigue and shortness of breath on exertion. AR 128.  Plaintiff's cardiomyopathy was related to her job as sales manager for Sears. AR 153. Plaintiff also suffered from cardiac arrhythmias, and required the use of an implanted cardiac defibrillator ("ICD"). AR 96, 121. Plaintiff submitted her disability claim on June 20, 2000. AR 156. Metlife approved her claim, and plaintiff began receiving long term disability benefits in September 2000 after completing the 140-day elimination period.

On August 11, 2000, plaintiff  filed for social security disability benefits ("SSDB"). AR 195. Following a hearing on her claim held March 13, 2002, an administrative law judge issued a decision finding claimant was disabled effective April 30, 2000 (AR 195), and entitled to SSDB beginning October 2000. AR 186.

In addition to use of the ICD, plaintiff's cardiomyopathy

---

[1] Cardiomyopathy is a condition causing weakness in the heart muscle.

was treated with medications. During the two years plaintiff received LTD benefits, plaintiff's medical condition improved with treatment. In December 2000, plaintiff was described by her doctor as "clinically well" (AR 121) and in November 2001 as "stable." AR 110. In March 2000, when she became disabled, her "ejection fraction" was at 25%.[2] AR 129. By April 2001, her ejection fraction had improved to 40-50%, which is where it had been prior to going on disability. AR 115, 129.

In March 2002, MetLife sent Dr. Patel a letter asking him about plaintiff's ability to return to work. AR 105. At MetLife's request, Dr. Patel completed a physical capacity evaluation in which he indicated that, in an eight-hour workday, plaintiff could sit eight hours, stand four hours, and walk two hours. Id. Dr. Patel was also specifically asked whether plaintiff was able to work fulltime at a sedentary physical exertion level occupation, and he checked "yes." Id.

Three months later, Dr. Patel completed another physical capacity evaluation. AR 99. At that time, he indicated that, in an eight-hour workday, plaintiff could sit eight hours, stand four hours, and walk two to four hours. Id. He also indicated that plaintiff could lift and carry up to ten pounds occasionally, and engage in other activities. Id.

MetLife reviewed plaintiff's claim in July 2002 to determine her continued eligibility for benefits. MetLife had her file reviewed by Dr. Mark Moyer, an independent physician

---

[2] An ejection fraction is the percentage of blood pumped out of the heart chamber during each heartbeat. Typically, the left ventricle pumps 55-75% of the blood within that chamber out to the body with each heartbeat. An ejection fraction below 40% indicates heart failure or cardiomyopathy.

consultant who is board certified in internal medicine. Dr. Moyer concurred with Dr. Patel that plaintiff could perform sedentary work. AR 39. Plaintiff's file was then referred to a vocational rehabilitation coordinator for a transferable skills and labor market analysis ("TSA"). Id. Taking into consideration plaintiff's education, background, training, and physical capacity, the vocational coordinator concluded that there were alternative sedentary occupations available in plaintiff's geographic area that plaintiff would be able to perform. AR 151-2. These alternative occupations included account information clerk, attendance clerk, and classified ad clerk. Id.

Plaintiff's LTD benefits were paid through September 16, 2002, which was the twenty four months after she recieved her first LTD benefit payment. AR 53. To be eligible for benefits after twenty four months, plaintiff not only had to be disabled from performing her own job, but also from performing any other occupation for which she was reasonably qualified. AR 14. Based on Dr. Patel's opinion that plaintiff could perform sedentary work, and based further on the results of the vocational TSA, MetLife concluded that plaintiff could perform alternate sedentary occupations, and plaintiff was advised in a letter dated July 15, 2002 that her last day of benefits would be

September 16, 2002. AR 41, 72.

By letter dated July 26, 2002, plaintiff requested that MetLife reconsider its decision to terminate her benefits. AR 72. In a letter dated July 22, 2002, Dr. Patel stated that plaintiff "continues to have significant difficulty in returning to even any kind of sedentary job because any kind of psychological stress at work causes significant problems with her cardiovascular condition . . ." AR 91. Dr. Patel further stated in this same letter "the patient has tried to return to work in the past with exacerbation of her symptoms as well as…her condition." Id. Dr. Patel concluded that plaintiff "should not be forced to return to…even sedentary work..." Id.

MetLife then re-evaluated plaintiff's claim and concluded that benefits were not payable after September 16, 2002. Plaintiff was advised of this decision in a four-page letter dated August 28, 2002. AR 66-69. In this letter, MetLife noted that Dr. Patel previously found that plaintiff was able to work; that plaintiff's medical records supported the conclusion that plaintiff's condition was stable and plaintiff was able to perform fulltime sedentary work; and that the TSA performed by MetLife's vocational rehabilitation coordinator found alternative job positions available in the geographic area that met plaintiff's education, training, and medical capabilities. AR 67-8. MetLife informed plaintiff that she had the right to submit a written request to appeal the decision terminating her LTD benefits. AR

69.

On February 12, 2003, plaintiff, through counsel, appealed the termination of her

disability benefits. AR 59. In support of her appeal, plaintiff submitted a new medical report

from Dr. Patel, dated February 12, 2003, in which Dr. Patel stated:

> Previous reports filled out by me state that the patient was fit for sedentary work, however based on her clinical condition and her symptomatology, there was never a time where I felt that this patient would be able to return to full-time employment.

AR 90.

Metlife referred plaintiff's medical records to Chandrakant Pujara, M.D., F.A.C.C., an independent physician consultant board certified in cardiology. In a report dated May 2, 2003, Dr. Pujara found "with the appropriate medical management and biventricular pacing, the patient has achieved a relatively stable cardiac status." AR 86. Dr. Pujara stated that plaintiff "has been relatively free of any significant cardiac compensation as documented by Dr. Patel's follow up notes." AR 85. Dr. Pujara then concluded that plaintiff was "capable of sedentary activity as per the U.S. Department of Labor Guidelines." Id. Dr. Pujara further opined:

> However, based on Dr. Patel's own physical capacity
> evaluation on June 12, 2002, the patient seems to be a
> reasonable candidate to try one of the sedentary job
> classes at least on a trial basis.  If the job environment
> entails [a] significant degree of emotional distress, and
> the patient is not able to cope with that, then certainly
> permanent disability can be considered.

AR 86.

After it received Dr. Pujara's report, MetLife affirmed its

earlier decision to

terminate plaintiff's benefits effective September 16, 2002.

MetLife concluded:

> We have determined that the documentation currently
> in the file does not support a disability that would
> prevent Ms. Glenn from performing any occupation,
> as defined in the Plan. Therefore, the original claim
> determination was appropriate.

AR 54.  Plaintiff filed the instant action on June 23, 2003.

## II.  Standard of Review

An ERISA administrator's denial of benefits under a plan is

subject to *de novo* review unless the plan grants the administrator

discretionary authority either to determine benefits or construe

the terms of the plan.  Firestone Tire & Rubber Co. v. Bruch,

489 U.S. 101, 103 (1989).  If the plan grants the administrator

such discretion, the denial of benefits is subject to the highly deferential arbitrary and capricious standard of review. Firestone, 489 U.S. at 115.

Here, plaintiff expressly concedes that the plan grants the administrator discretion and that the plan administrator's decision is subject to the arbitrary and capricious standard of review.  "[T]he arbitrary and capricious standard is the least demanding form of judicial review of administrative action." Williams v. International Paper Co., 227 F.3d 706, 712 (6th Cir.2000)  A decision regarding eligibility for benefits is not arbitrary and capricious if it is "rational in light of the plan's provisions." Daniel v. Eaton Corp., 839 F.2d 263, 267 (6th Cir.1988).  Stated differently, "[w]hen it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." Davis v. Kentucky Finance Cos. Retirement Plan, 887 F.2d 689, 693 (6th Cir.1989) (internal quotations and citation omitted).  The administrator's decision must be upheld if "it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." Baker v. United Mine Workers of Am. Health and Retirement Funds, 929 F.2d 1140, 1144 (6th Cir.1991).

Nevertheless, merely because our review must be deferential does not mean our review must also be inconsequential. While a benefits plan may vest discretion in the plan administrator, the federal courts do not sit in review of the administrator's decisions only for the purpose of rubber stamping those decisions. As we observed recently, "[t]he arbitrary-and-capricious ... standard does not require us merely to rubber stamp the administrator's decision." Jones v. Metropolitan Life Ins. Co., 385 F.3d 654, 661 (6th Cir.2004) (citing McDonald v. Western-Southern Life Ins. Co., 347 F.3d 161, 172 (6th Cir.2003)). Indeed, "[d]eferential review is not no review, and deference need not be abject." McDonald, 347 F.3d at 172. Our task at all events is to "review the quantity and quality of the medical evidence and the opinions on both sides of the issues." Id.

Moon v. Unum Provident Corp., 405 F.3d 373, 378-79 (6th Cir. 2005).

The Sixth Circuit has recognized that an actual conflict of interest exists when an insurer both decides whether an employee is eligible for benefits and pays those benefits. Darland v. Fortis Benefits Ins. Co., 317 F.3d 516, 527 (6th Cir. 2003). "[I]f a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" Firestone Tire & Rubber Co., 489 U.S. 101, 115 (1989)(quoting Restatement (Second) of Trusts § 187, cmt. d (1959)).  In the instant case, defendants decide whether a claimant is eligible for benefits, and pays those

benefits.  A conflict of interest therefore exists which must be considered as a factor when applying the abuse of discretion standard.  The Court will consider and weigh this factor throughout the following discussion.

### III. Discussion

Plaintiff argues that MetLife's decision to terminate her LTD benefits must be overturned in light of the arguments asserted by plaintiff's attorneys before the ALJ and the ALJ's finding that plaintiff was disabled.  For this proposition, plaintiff relies primarily upon  Ladd v. ITT Corp., 148 F.3d 753 (7th Cir. 1998)(opinion by Posner, J.).  The Sixth Circuit Court of Appeals summarized Ladd as follows:

> [I]n Ladd v. ITT Corp., 148 F.3d 753, 755-56 (7th Cir.1998), the Seventh Circuit held that the plan administrator's denial of disability benefits was arbitrary and capricious where none of the physicians who examined the plaintiff found that she was capable of working; the insurance company encouraged and assisted the plaintiff in applying for Social Security disability benefits, which were granted after an administrative law judge found that the plaintiff was totally disabled; and the plaintiff's condition was worse when the plan administrator denied her benefits under the plan than when she was granted Social Security benefits. In that case, after the plaintiff was awarded Social Security disability benefits, she was referred by MetLife to a doctor who worked for Network Medical Review Company, the same company employed by Fortis in this case. Without examining the plaintiff, the doctor for Network

Medical Review concluded "in a perfunctory report that Ladd had sufficient 'residual functional capacities' to work a full eight-hour day at a sedentary job." Id. at 755. On appeal, the Seventh Circuit found that "[t]he grant of social security benefits" had "additional significance:"

It brings the case within the penumbra of the doctrine of judicial estoppel--that if a party wins a suit on one ground, it can't turn around and in further litigation with the same opponent repudiate the ground in order to win a further victory. The doctrine is technically not applicable here, because MetLife and ITT, the defendants in this suit, were not parties to the proceeding before the Social Security Administration. Yet they "prevailed" there in a practical sense because the grant of social security benefits to Ladd reduced the amount of her claim against the employee welfare plan. If we reflect on the purpose of the doctrine, which is to reduce fraud in the legal process by forcing a modicum of consistency on a repeating litigant, we see that its spirit is applicable here. To lighten the cost to the employee welfare plan of Ladd's disability, the defendants encouraged and supported her effort to demonstrate total disability to the Social Security Administration, going so far as to provide her with legal representation. To further lighten that cost, it then turned around and denied that Ladd was totally disabled, even though her condition had meanwhile deteriorated. In effect, having won once the defendants repudiated the basis of their first victory in order to win a second victory. This sequence casts additional doubt on the adequacy of their evaluation of Ladd's claim, even if it does not provide an independent basis for rejecting that evaluation.

Id. at 756 (citations omitted).

Darland v. Fortis Benefits Ins. Co., 317 F.3d 516, 529-30 (6th Cir. 2003), overruled on other grounds, Black & Decker Disability Plan v. Nord, 538 U.S. 822 (2003). Facing similar facts, and following Ladd, the court in Darland held that the

12

principles of judicial estoppel weighed against the plan administrator taking "inconsistent positions." 317 F.3d at 530.

Here, as in Ladd and Darland, MetLife encouraged and assisted plaintiff in obtaining SSDB, and an ALJ found that plaintiff was disabled. Nonetheless, the Court finds that Ladd and Darland are distinguishable. In the instant case, the hearing before the ALJ was held on March 13, 2002. On that same day, plaintiff's treating physician, Dr. Patel, answered "yes" to MetLife's question "Do you believe Ms. Glenn is able to work in a sedentary physical exertion level occupation?" Dr. Patel's March 13, 2002 response was not part of the record before the ALJ. A statement by plaintiff's own physician indicating that she could perform sedentary work would clearly have been significant to any determination of total disability. MetLife cannot be bound by the proceedings before the ALJ or the ALJ's decision for the simple reason that the records before the ALJ and MetLife were materially different. The Court therefore concludes that Ladd and Darland are inapplicable.[3]

Plaintiff also contends that MetLife was bound by its initial determination of total disability. At the time MetLife made its

---

[3] Further, it is unclear whether MetLife actually benefited from plaintiff's receipt of SSDB. As plaintiff points out in her reply brief, the Plan gave MetLife the right to deduct SSDB regardless of whether plaintiff applied for them. AR 245.

decision to terminate plaintiff's LTD benefits, the definition of "totally disabled" had changed from "unable to perform each of the material duties of [her] regular job" to include "unable to perform the duties of *any* gainful work . . . ." (emphasis added). Given the change in the definition of "totally disabled", plaintiff's argument is without merit.

Plaintiff additionally argues that it would be unfair to require her to return to work because if she attempts to work but cannot, she would lose her disability coverage. In making this argument, plaintiff refers to the statement of Dr. Pujara, who stated in part:

> However, based on Dr. Patel's own physical capacity evaluation on June 12, 2002, the patient seems to be a reasonable candidate to try one of the sedentary job classes at least on a trial basis. If the job environment entails [a] significant degree of emotional distress, and the patient is not able to cope with that, then certainly permanent disability can be considered.

AR 86. Thus, Dr. Pujara acknowledged the possibility that work-related emotional distress could prevent plaintiff from working. MetLife contends that the possibility that plaintiff's return to work may be unsuccessful would not be grounds to continue benefits, as the Plan insures only against actual disabilities, not possible future disabilities. The Court agrees. Read in context, Dr. Pujara's qualification is a recognition that

the impact of real or perceived emotional stress is difficult to gauge. It was not an expression that plaintiff was incapable of sedentary work. In any event, the Plan does not alter the definition of "totally disabled" on the basis of a possible loss of coverage.

Plaintiff maintains that the Court should enter judgment in her favor because MetLife did not give her the opportunity to respond to Dr. Pujara's report. Defendants argue that plaintiff was given the opportunity to submit her own supporting evidence in connection with her appeal, and that the plan administrator has the right to review that evidence with the assistance of a consultant. Defendants contend that if plaintiff had been given the opportunity to respond to Dr. Pujara's report with additional evidence, then MetLife would have had the right to seek review of that new evidence by a consultant, and the process would never end.

Plaintiff offers no authority for the proposition that MetLife's use of Dr. Pujara's report violated her rights under ERISA. Inasmuch as the process entails the interpretation of medical evidence, MetLife was entitled to enlist the help of a consultant to review that evidence. To require an opportunity to respond to every consultant's report would unduly burden the

process.  The Court finds that in the circumstances this case presents, ERISA did not require MetLife to provide plaintiff with a copy of Dr. Pujara's report and an opportunity to respond to the report before it issued its decision on plaintiff's appeal.

Defendants argue that MetLife's decision to terminate plaintiff's LTD benefits was rational and supported by substantial evidence.  Plaintiff maintains that there is no evidence to support MetLife's decision.

On March 13, 2002, plaintiff's treating physician, Dr. Patel, answered "yes" to MetLife's question,  "Do you believe Ms. Glenn is able to work in a sedentary physical exertion level occupation?"  At the same time, Dr. Patel indicated that, in an eight-hour workday, plaintiff could sit eight hours, stand four hours, and walk two hours.

MetLife also had plaintiff's file reviewed by an independent physician consultant board certified in internal medicine, Dr. Mark Moyer. Dr. Moyer concurred with Dr. Patel that plaintiff could perform sedentary work.

The vocational coordinator concluded that there were alternative sedentary occupations available in plaintiff's geographic area that plaintiff would be able to perform. These alternative occupations included account information clerk,

attendance clerk, and classified ad clerk.  In addition to considering plaintiff's physical limitations, the vocational coordinator specifically took into account Dr. Patel's statement that plaintiff should not be subjected to "emotional distress."

> In a letter dated February 12, 2003, Dr. Patel stated:
>
> Previous reports filled out by me state that the patient was fit for sedentary work, however based on her clinical condition and her symptomatology, there was never a time where I felt that this patient would be able to return to full-time employment.

Hence, Dr. Patel expressly acknowledged that he had stated that plaintiff was fit for sedentary work.  The Court finds that MetLife did not abuse its discretion by viewing Dr. Patel's recantation with skepticism.  See United States v. Willis, 257 F.3d 636, 645-46 (6th Cir. 2001)(recognizing that affidavits recanting trial testimony are viewed with "extreme suspicion.").

MetLife also had before it Dr. Pujara's report.  Dr. Pujara, a cardiologist, indicated "with the appropriate medical management and biventricular pacing, the patient has achieved a relatively stable cardiac status." Dr. Pujara stated that plaintiff "has been relatively free of any significant cardiac compensation as documented by Dr. Patel's follow up notes." Dr. Pujara then concluded that plaintiff was "capable of sedentary activity as per the U.S. Department of Labor Guidelines." Id. Dr. Pujara

additionally stated that plaintiff was "a reasonable candidate to try one of the sedentary job classes at least on a trial basis."

The Court finds that the above constitutes substantial evidence supporting MetLife's determination that plaintiff was no longer totally disabled as the Plan defines that term.  Even considering MetLife's conflict of interest, the Court holds that MetLife's decision to terminate plaintiff's LTD benefits was rational and did not constitute an abuse of discretion. Defendants are therefore entitled to judgment in their favor.

### IV.  Disposition

Based on the above, the Court **DENIES** plaintiff's motion for entry of judgment and **GRANTS** defendants' cross-motion for entry of judgment.

The Clerk shall enter a final judgment in favor of defendants and against plaintiff, dismissing this action with prejudice.

The Clerk shall remove this case from the Court's pending cases list.

The Clerk shall remove Doc. 9, Doc. 11 and Doc. 12[4] from the Court's pending CJRA motions list.

**IT IS SO ORDERED.**

                                  **/s/ George C. Smith**

                                  **GEORGE C. SMITH, JUDGE**
                                  **UNITED STATES DISTRICT COURT**

---

[4] Doc. 11 and Doc 12 were improperly designated as motions.  Doc. 10, which is a motion for judgment on the administrative record, was not docketed as a motion.